jointly mean that well more than 25 percent of our Nation's gasoline will contain oxygenates, including ethanol, ETBE, MTBE, and other oxygenates"); 136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ("the oxygenated fuels program will allow for the use of MTBE and ethanol as additives to achieve the required level of oxygen"); 136 Cong. Rec. S 6459 (remarks of Sen. Daschle) (discussing the increased costs of gasoline complying with Clean Air Act on the assumption that MTBE would be used).

20. Congress intended to affirmatively encourage the use of MTBE for these purposes. Conference Report, Clean Air Act Amendments of 1990, 1990 CAA Leg. Hist. 1451, 1787 ("[t]he agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon monoxide pollution, starting in 1992. These provisions will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative"); 136 Cong. Rec. S 16954 (1990) (remarks of Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S 17514 (1990) (remarks of Sen. Heinz) ("reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE"). In fact, Congress viewed the increased use of oxygenates like MTBE as "good for energy security and our balance of trade, as well as the environment" because RFG with a 15% MTBE content required 15% less gasoline. 136 Cong. Rec. S 3513 (1990) (remarks of Sen. Daschle).

21. Congress even drafted the Clean Air Act Amendments to make certain MTBE could be used to meet them. For instance, the percentage weight requirements for oxygen were amended during the Senate's consideration of the 1990 Clean Air Act amendments to lower the amount of oxygen required in gasoline used in the OFP from

3.1 percent to 2.7 percent, precisely to ensure that refiners could use MTBE to meet the oxygenate mandate requirement:

> The level of 2.7 percent was chosen in part to provide more even opportunities for competition between the two major oxygenates, methyl tertiary butyl ether (or MTBE), and ethyl alcohol (or ethanol). The [EPA] Administrator may not discriminate among these different oxygenates, and should encourage fair competition among them.

136 Cong. Rec. H 12848, 12859 (1990) (remarks of Mr. Sharp).

22. Senator Daschle's comments are perhaps the most succinct evidence of Congressional intent: "We want MTBE . . . I want ETBE and ethanol and MTBE and other fuels to play a role in achieving a variety of national objectives." 136 Cong. Rec. S. 2280, 2289 (1990).

23. In short, in enacting the oxygenate mandates, Congress wanted petroleum refiners to use MTBE in gasoline.

24. Congress was also aware that efforts to comply with its new oxygenate mandates for fuel content could have a serious impact on gasoline supplies on a national, regional and local level. Consequently, Congress authorized EPA to delay each of the OFP and RFG requirements for up to two or three years, respectively, if the Administrator determined that domestic supplies of compliant gasoline were inadequate. 42 U.S.C. § 7545(k)(6)(B) & (m)(2).

25. After the passage of the Clean Air Act amendments in 1990, the EPA began considering regulations for the implementation of both the OFP and RFG requirements. The EPA engaged in a "regulatory-negotiation" process to develop these regulations. This process involved the active participation of the EPA and recognized

stakeholders – petroleum refiners, environmental groups, etc. – in negotiations relating to the details of how each program should be implemented.

26. In 1991, the EPA approved only the following compounds as additives to achieve the requisite oxygen content in gasoline for the OFP: MTBE, ethanol, methanol, tertiary amyl methyl ether ("TAME"), ethyl tertiary butyl ether ("ETBE"), tertiary butyl alcohol ("TBA"), and diisopropyl ether ("DIPE"). *Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of Clean Air Act as Amended*, 56 Fed. Reg. 31151, 31154 (July 9, 1991).

27. The EPA began implementing the OFP requirements in 1992. Pursuant to Section 7545(m), the Administrator considered and approved changes to State Implementation Plans to require the use of oxygenated fuels in nonattainment areas for carbon monoxide.

28. Like Congress, the EPA understood that MTBE would be "the most common oxygenating compound" used by refiners to comply with the CAA's new air emissions standards. *Approval and Promulgation of Implementation Plan*, 56 Fed. Reg. 5458, 5465 (Feb. 11, 1991).

29. In 1994, EPA reaffirmed its approval of MTBE by formally certifying MTBE as an acceptable oxygenate for the RFG program. *See* 40 C.F.R. § 80.46. Notably, the EPA again acknowledged that "[g]iven present and projected conditions, EPA . . . expects that MTBE and ethanol will be the most commonly used oxygenates during Phase I of the [RFG] program." *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716,

13

7732 (Feb. 16, 1994). The other six oxygenates approved for use in the OFP were the only oxygenates available for use in the RFG.

30.   RFG requirements went into effect on January 1, 1995.

31.   Thus, to refine, distribute, or market gasoline in any area subject to OFP or RFG requirements, consistent with EPA regulations, refiners must include one of the seven approved oxygenates in gasoline at the requisite concentration.

32.   In promulgating its requirements for the RFG, the EPA also specifically and expressly concluded that its regulations of fuel content preempted State law relating to the content of such fuel. *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994).

33.   The EPA's regulations pertaining to fuel content cover more than 400 pages of the Code of Federal Regulations, set forth at 40 CFR Parts 79 and 80.

34.   At the time the EPA promulgated the RFG regulations, it knew of MTBE's potential to contaminate groundwater. *See Final Rule, Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Inter-Agency Committee*, 53 Fed. Reg. 10391, 10392 (Mar. 31, 1988). It also knew there was not a sufficient capacity of ethanol, on a nationwide basis, nor sufficient infrastructure for ethanol, to comply with the regulation. Accordingly, it expected that refiners would extensively use MTBE to comply with the oxygenate requirement. *See, e.g.*, 59 Fed. Reg. 7716, 7732; *Regulation of Fuel and Fuel Additives: Reformulated Gasoline Adjustment*, 65 Fed. Reg. 42920 (Jul. 12, 2000). In compliance with the EPA's regulation of RFG, the industry added MTBE to gasoline to comply with the federal mandate.

35. In addition to the comprehensive fuel content regulations, the federal government has also promulgated extensive regulations covering the transport and storage of gasoline. It has long been well understood that gasoline should not be permitted to escape into the environment. Indeed, Congress specifically amended the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6691 *et seq.*, to provide a comprehensive set of regulations governing the storage of gasoline, and an equally comprehensive set of penalties to ensure compliance with federal mandate. Section 6691b provides the EPA with broad powers to order, outright, the cleanup of leaking tanks, and § 6991e provides civil fines to tank owners that do not comply with remediation orders. The corresponding EPA regulations, 40 CFR 280.10 *et seq.*, were finalized in 1988, years before the recent wave of state court suits was set in motion. These regulations impose, among other things, a duty on underground storage tank owners to promptly investigate and abate the scope of any release of gasoline into the environment. Significantly, these regulations are designed to protect against *any* releases of gasoline, whether including MTBE or not.

## JURISDICTIONAL BASIS

36. A defendant may remove to the appropriate federal district court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 163 (1997) (quoting 28 U.S.C. § 1441(a)).

37. The district courts have original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." *Id.* at 163 (quoting 28 U.S.C. § 1331).

38. Not only will federal jurisdiction exist if the plaintiffs' well-pleaded complaint establishes that federal law creates the cause of action, *e.g.*, *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808 (1986), but federal question jurisdiction also exists if the plaintiffs' right to relief necessarily depends on the resolution of a "substantial question" of federal law. *Franchise Tax Bd. of the State of Calif. v. Construction Laborers Vacation Trust for So. Calif.*, 463 U.S. 1, 13 (1983).

39. On its face, the Complaint attempts to assert that the use of MTBE in gasoline constitutes an inherent design defect. In order to prevail under Massachusetts law on Plaintiffs' claim of breach of warranty due to design defect, Plaintiffs must demonstrate: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the feasibility of a safer alternative design; the financial cost of an improved design; and the adverse consequences to the product and to the consumer that would result from an alternative design. *Colter v. Barber-Greene Co.* 525 N.E.2d 1305, 1310 (Mass.1988), *citing Back v. Wickes Corp.*, 378 N.E.2d 964, 970 (Mass. 1978). Plaintiffs' burden is to prove that there exists "an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Colter*, 525 N.E.2d 1305 at 1311, *citing Uloth v. City Tank Corp.*, 384 N.E.2d 1188 (Mass. 1978). Similarly, to sustain their negligence action, Plaintiffs have the burden to show that the Defendants failed to exercise reasonable care to eliminate avoidable or foreseeable dangers to the user, *Wasylow v Glock, Inc.*, 975 F.

Supp. 370, 379 (D. Mass. 1996), *citing Uloth,* 384 N.E.2d at 1192-1193. Plaintiffs could not reach the jury without showing "an available design modification which would reduce the risk without undue cost or interference" with performance. *Id.* The risk-utility analysis mandated by such a test pits the wisdom of Congress and the EPA against the deliberations of a Massachusetts jury.[4]

40. Accordingly, Plaintiffs' *prima facie* case requires proof that the existing design is unreasonably dangerous and that the presence of a practicable alternative satisfying the RFG program exists. (Even Plaintiffs do not allege that the RFG program can be compromised in order to serve tort law.)

41. Plaintiffs acknowledge that it must prove the relative risks and utilities of gasoline containing MTBE, including the feasibility of alternatives, by its allegation that "MTBE was not the only viable option to achieve higher octane in gasoline." (Am. Cmplt. ¶ 135; "The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE." (Am. Cmplt. ¶ 204); and ("Safer, more environmentally sound alternatives to MTBE were available." (Am. Cmplt. ¶ 205).

42. Plaintiffs would ask the Massachusetts state court to construe a complicated web of federal statutes and implementing regulations that reflects the EPA's own balancing and conclusions. That court's conclusions could easily undermine the

---

[4] With respect to the duty to warn of dangerous/defective products, the Massachusetts Supreme Court has adopted the principles in the Restatement (Third) of Torts Products Liability §2(c). *Vassallo v. Baxter Healthcare Corp.* 696 N.E.2d 909, 923 (1998). The Third Restatement discusses the rationale for its allocation of responsibility in such cases, and states that "risk-utility" balancing is necessary in order to evaluate such defects. Having a Massachusetts jury decide the "various trade-offs [that] need to be considered" runs the risk of upsetting Congress's and the EPA's policy decisions. Restatement (Third) of Torts: Products Liability § 2, Comment a.

policy choices reflected in the EPA's initial waiver of MTBE into commerce and its subsequent registration of MTBE as one of the few oxygenates that could be used.[5]

43.    Removal is also appropriate where, as here, the federal government has completely preempted the field. *Beneficial Nat'l Bank v. Anderson*, 123 S. Ct. 2058, 2063 (2003). Section 211(c)(4) of the Clean Air Act expressly provides "no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine." 42 U.S.C. § 7545(c)(4). Thus, Congress has expressly indicated its intention to completely preempt the field. No state (or state court) may attempt to regulate fuel content.

44.    Consistent with Congress' express intent to completely preempt all State regulation of fuel content, and recognizing the national scope of gasoline distribution, the EPA has announced its intent to completely preempt State regulation of motor vehicle fuel content. In promulgating its regulations pursuant to the RFG program, the EPA stated as follows:

> The regulations proposed here will affect virtually all of the gasoline sold in the United States. As opposed to commodities that are produced and sold in the same area of the country, gasoline produced in one area is often distributed to other areas. The national scope of gasoline production and distribution suggests that federal rule should preempt State action to avoid an inefficient patchwork of potentially conflicting regulations. Indeed, Congress

---

[5] It is beyond dispute that the choice of gasoline components involves tradeoffs. Each of the approved oxygenates share, to varying degrees, the very characteristics of MTBE of which Plaintiffs now complain. And certain oxygenates other than MTBE pose additional tradeoffs and risks. If state product liability claims such as those brought by Plaintiffs are permitted to coexist with federal fuel content regulations, there is no legal reason why comparable claims cannot be asserted against Defendants and others for using any of the oxygenates approved to comply with federal fuel content requirements. Thus, Defendants, although required by federal law to blend an oxygenate into gasoline, have had and will have no means of determining which oxygenates they may use without subjecting themselves to the uncertainties of what is, in effect, state-by-state fuel content regulation through individual tort actions for adding MTBE or adding any of the other "alternative" oxygenates.

18

> provided in the 1977 Amendments to the Clean Air Act that federal fuels regulations preempt non-identical State controls except under certain specified circumstances. EPA believes that the same approach to federal preemption is desirable for the reformulated gasoline and anti-dumping programs.

59 Fed. Reg. 7716, 7809.

45. A purported state claim challenging the design of gasoline is really a federal claim asserting that the EPA's cost-benefit analysis with respect to fuel content – grounded in that Agency's technical expertise and nationally focused judgment – does not adequately protect the environment. In fact, the Amended Complaint, on its face, directly challenges the EPA's findings that MTBE reduces air pollution. (Am. Cmplt. ¶¶ 135-138). Congress unambiguously expressed that the EPA has exclusive authority to determine the efficacy of fuel or fuel additives with respect to air pollution. 42 U.S.C. § 7545(c)(4)(A).

46. Following promulgation of the RFG regulations in 1994, no one challenged EPA's exercise of discretion to preempt the entire field of motor vehicle fuel content, although any interested states, private or public organizations, or individuals (including Plaintiffs in this case) were free to do so under the exclusive terms for such review set forth in 42 U.S.C. § 7607(b)(1). Accordingly, state court litigants cannot now collaterally challenge EPA's determination on preemption in the guise of state tort actions.

47. The First Amended Complaint requests that the Massachusetts state court supplant the judgment and conclusions of Congress and the EPA regarding fuel content with its own. It thus interferes with an area that Congress has expressed a clear intent to carve out for federal dominance, given the national reach of the gasoline transport and

delivery system, and the effects of these products on the nation as a whole, not just on the citizens or environment of a particular state. Indeed, Plaintiffs' claim presents precisely the issue that Congress placed within the sole purview of the EPA, when it gave EPA the exclusive authority to determine whether a fuel or fuel additive could be introduced into commerce, and again when it required the agency to certify oxygenates for the RFG program, "taking into consideration the cost of achieving such emission reductions, *any nonair-quality* and other air-quality *environmental impacts* and energy requirements." 42 U.S.C. § 7545(k)(1) (emphasis added). And the federal law sets up a specific framework that the EPA must use in balancing these various factors. Thus, a state law tort claim is in fact covered by the federal scheme and remitted to the EPA for its determination.

48.  If forty or more state courts determine the question of federal preemption, the result will be a landslide of legal and factual outcomes that could be at odds not only with the Congressional intent and the EPA's decisions based on its interpretation of that intent, but at odds with one another. Each state has its own standards for what constitutes a dangerous or defective product, its own rules for the type of balancing a manufacturer has to undertake to supply its products in that state, and its own factors for evaluating the hazards to its citizenry. Within each state (or even within various subdivisions within the same state) judges can apply those standards differently or juries can draw different conclusions based on their understanding of the balancing tests. Conceivably, the industry could be held liable in Massachusetts for its decisions to add MTBE, exonerated in another state court, fined in New Hampshire and subjected to millions of dollars in damages in California. Such disparate results will eviscerate the carefully constructed federal scheme and the industry's ability to rely upon the Congressional intent to both

provide and maintain an assured supply of gasoline and to protect the nation's environment and its citizens.[6]

49.     Yet another ground for removal of this case is the federal officer removal statute, 28 U.S.C. § 1442, which permits removal by corporations acting under the direction of federal officers or agencies. Pursuant to the Clean Air Act and its implementing regulations, the industry is required to use oxygenates in gasoline. Further, as explained more fully above, see ¶¶ 13 -35, *supra*, both Congress and EPA fully understood and expected MTBE to be used in the vast majority of oxygenated gasoline sold in the United States. Therefore, a federal directive caused the conduct about which Plaintiffs complain and removal under 28 U.S.C. § 1442 is appropriate.

50.     In addition to the jurisdiction over the claims against Defendants, as set forth above, this Court has supplemental jurisdiction over the remainder of this action pursuant to 28 U.S.C. § 1367.

WHEREFORE, Defendants hereby remove to this Court the action captioned *Town of Duxbury, et al. v. Amerada Hess Corp., et al.*, Case No. 03-4326-A, from the Superior Court of Suffolk County.

---

[6] Recognizing how imperative uniformity is to the national distribution system, Congress did not even want to risk inconsistent results among the federal circuits with respect to judicial review of fuel content regulations. Accordingly, it vested exclusive jurisdiction in the D.C. Circuit Court of Appeals. 42 U.S.C. § 7607(b).

CITGO Petroleum Corporation

By: /s/ *signature*
One of Its Attorneys

Dated: November 26, 2003

J. Owen Todd
Kathleen Genova
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626

Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7600
(312) 692-1718 (fax)

Respectfully submitted,

**Exxon Mobil Chemical Company, Inc.**
**Exxon Mobil Corporation**
**Exxon Mobil Oil Corporation**
**Exxon Mobil Refining and Supply Co.**
**Mobil Corporation**

Dated: November 24, 2003

*/s/ Deborah C Barnard*
Deborah E. Barnard
  BBO No. 550654
Robin L. Main
  BBO. No. 556074
Tara Myslinski
  BBO No.644936
**Holland & Knight LLP**
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

# 1383531_v1

Respectfully submitted,

*/s/ William L. Parker*

William L. Parker, BBO No. 549839
FITZHUGH, PARKER & ALVARO LLP
155 Federal Street, Suite 1700
Boston, Massachusetts 02110-1727
Telephone: (617) 695-2330
Facsimile: (617) 695-2335

Richard E. Wallace, Jr.
WALLACE KING MARRARO & BRANSON, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: 202.204.1000
Facsimile: 202.204.1001

Attorneys for Defendants Equilon Enterprises, LLC, individually and also known as Shell Oil Products US; Motiva Enterprises, LLC; Shell Oil Company; Shell Oil Products Company; Shell Oil Products Company, LLC; Shell Petroleum, Inc.; Shell Trading (US) Company, individually and formerly known as Equiva Trading Company, and also known as Stusco

Dated: November 25, 2003

Respectfully submitted,

_____
William L. Parker, BBO No. 549839
FITZHUGH, PARKER & ALVARO LLP
155 Federal Street, Suite 1700
Boston, Massachusetts 02110-1727
Telephone: (617) 695-2330
Facsimile: (617) 695-2335

Richard E. Wallace, Jr.
WALLACE KING MARRARO & BRANSON, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: 202.204.1000
Facsimile: 202.204.1001

Attorneys for Defendant Chevron U.S.A., Inc., individually and formerly known as Gulf Oil Corp. (d/b/a Chevron Products Company d/b/a Chevron Chemical Company)

Dated: November 25, 2003

Respectfully submitted,

*[signature]*

Tracie L. Longman BBO #546461
Andrew G. Wailgum BBO #631965
Seth M. Wilson BBO #640270
MURTHA CULLINA LLP
99 High Street
20th Floor
Boston, MA 02110
617-457-4000
617-482-3868 (Facsimile)

J. Andrew Langan
Mark S. Lillie
R. Chris Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
312-861-2000
312-861-2200 (Facsimile)

Attorney for Defendants:*
Atlantic Richfield Company; BP America, Inc.; BP Amoco Chemical Company; BP Company North America Inc.; BP Corporation North America Inc.; BP Global Special Products (America) Inc.; BP Products North America Inc. (formerly known as Amoco Oil Company and misnamed as BP Products North Americas, Inc.)

---

* To the extent the Complaint erroneously names BP entities that do not exist or no longer exist, the consent of fictitious or non-existent entities is not necessary for removal. To the extent joinder in or consent to removal is required, the BP group of companies, and each of them, join in and consent to removal.

Respectfully submitted,

*[signature]*

Tracie L. Longman BBO #546461
Andrew G. Wailgum BBO #631965
Seth M. Wilson BBO #640270
MURTHA CULLINA LLP
99 High Street
20th Floor
Boston, MA 02110
617-457-4000
617-482-3868 (Facsimile)

J. Andrew Langan
Mark S. Lillie
R. Chris Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
312-861-2000
312-861-2200 (Facsimile)

Attorney for Defendants:*
Atlantic Richfield Company; BP America, Inc.; BP Amoco Chemical Company; BP Company North America Inc.; BP Corporation North America Inc.; BP Global Special Products (America) Inc.; BP Products North America Inc. (formerly known as Amoco Oil Company and misnamed as BP Products North Americas, Inc.)

---

* To the extent the Complaint erroneously names BP entities that do not exist or no longer exist, the consent of fictitious or non-existent entities is not necessary for removal. To the extent joinder in or consent to removal is required, the BP group of companies, and each of them, join in and consent to removal.