IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

---------------------------------------------------x
:
**TOWN OF DUXBURY,** *et al.*,    :
:
        Plaintiffs,    :    Civil Action No. 2003-12399RGS
:
    v.    :
:
**AMERADA HESS CORP.,** *et al.*,    :
:
        Defendants.    :
:
---------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFFS' MOTION FOR REMAND

This case asserts only state-law claims for injuries caused by Defendants' contamination of groundwater with a chemical, MTBE, that they blend into gasoline for sale in this Commonwealth. The case presents no federal question. The parties are not of diverse citizenship. Nonetheless, Defendants have removed the case to this Court, arguing principally that the claims against them have been preempted by Federal law, and that the case ought to be heard in MDL 1358, *In re MTBE Products Liability Litigation* (S.D.N.Y.) (Scheindlin, J.).

As shown below, Defendants' arguments have no merit. Long-settled principles of federalism bar the removal of a case filed in state court, asserting only state-law claims, on the grounds of a federal preemption defense. *See, e.g., Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 14 (1983). While a narrow exception to this rule exists, *see, e.g., Franchise Tax Board*, 463 U.S. at 23–24, this case falls well outside of it. Moreover, the MDL judge, Shira Scheindlin — to whom the Defendants

urge transfer of this case — has already heard and rejected these Defendants' preemption arguments. *See In re MTBE Products Liability Litigation*, 175 F. Supp. 2d 593, 611–16 (S.D.N.Y. 2001) ("*MTBE*").

Defendants' other grounds for removal have no firmer foundation. Defendants assert that removal is appropriate because they put MTBE in gasoline at the direction of the United States Government; but nothing in title 28 suggests that private corporations selling products subject to Federal regulations act in an official capacity for the purposes of the removal statutes. Because we have filed an Amended Complaint including Texaco entities as defendants, based on other similar cases we anticipate that Defendants will claim that the confirmation order entered fifteen years ago in the *In re Texaco* bankruptcy creates federal bankruptcy jurisdiction over this case. However, this case names dozens of defendants other than Texaco and the complaint asserts no pre-petition claim against Texaco that could have been discharged by Texaco's 1988 confirmation order.

This removal was unwarranted. This Court ought to remand the case forthwith, and award Plaintiffs their costs and a reasonable attorney fee under 28 U.S.C. § 1447(c).

## I.    Federal Preemption Provides No Basis For Removal.

Defendants argue that this case presents a federal question justifying removal because the Clean Air Act and EPA regulations, which required Defendants to blend an oxygenate into their gasolines, preempt these state-law claims. *See* Notice of Removal ¶¶ 41-43. Their argument, however, ignores the long-settled rule that a preemption defense, by itself, does not warrant removal of a case to a Federal forum. "Since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption,

2

even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 14 (1983). *Accord, e.g., Beneficial National Bank v. Anderson*, 123 S. Ct. 2058, 2062 (2003); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 63 (1987); *Hernandez v. Conriv Realty Associates*, 116 F.3d 35, 38 (2d Cir. 1997); 14B C. Wright, A. Miller & E. Cooper, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3d § 3722 (2003) ("a state-initiated case will not be removable based upon a federal question that is raised by way of defense, even when that defense contends that the plaintiff's state-law claim has been preempted by federal law").

Moreover, the predicate of Defendants' argument is unfounded. Defendants bear the burden of proving their entitlement to removal, *see Pullman Co. v. Jenkins*, 305 U.S. 534, 540 (1939); *see also Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand"), but they have not shouldered it. Indeed, the Court hearing the MDL 1358 proceedings, to which the Defendants urge transfer, has already heard and rejected these Defendants' same arguments on a complete record. *See MTBE*, 175 F. Supp. 2d at 611–16. There, Judge Scheindlin correctly held that Act nowhere expressly preempts state-law tort claims for MTBE contamination of drinking water supplies. *See MTBE* at 614. Nor, as Judge Scheindlin further held, are these state-law claims "conflict preempted," which requires a showing that the state laws at issue, if enforced, would make it impossible for Defendants to comply with federal law. *See id.* at 614–16. Defendants conceded in MDL 1358 and elsewhere that the EPA specified no fewer than *seven* different substances for use as oxygenates under the Act. *See, e.g.*, 56 FR 31154 (July 9, 1991).

3

exclusive remedies to displace state-law rights of action. *See, e.g., Beneficial National Bank,* 123 S. Ct. at 2063–64; *Metropolitan Life,* 481 U.S. at 64–66; *Franchise Tax Board,* 463 U.S. at 23–24; *Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998); *Schmeling v. Nordam,* 97 F.3d 1336, 1342–43 (10th Cir. 1996); *Goepel v. National Postal Mail Handlers Union,* 36 F.3d 306, 311–13 (3d Cir. 1994); *Aaron v. National Union Fire Ins. Co.,* 876 F.2d 1157, 1165–66 (5th Cir. 1989). Beyond the ERISA and LMRA cases, "most attempts by state court defendants to remove by invoking the complete-preemption doctrine have been rebuffed" because "the doctrine represents a deviation from well-settled limiting principles on federal subject matter jurisdiction and the potential effect expansive application of complete preemption would have on values of federalism." 14B C. Wright, A. Miller & E. Cooper, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3d § 3722.1, at nn.27–28 (2003).

Defendants claim that "the federal government has completely preempted" the claims asserted in this case because the Clean Air Act "expressly provides 'no State (or political subdivision thereof) may prescribe or attempt to enforce, *for purposes of motor vehicle emission control*, any control or prohibition respecting any characteristic or component of a fuel or fuel additive.'" Notice of Removal ¶ 43, *quoting* 42 U.S.C. § 7545(c)(4)(emphasis added). Judge Scheindlin, however, has already held in MDL 1358, against these Defendants, that such language does not evince any Congressional intent to preempt state-law cases or claims aimed at protecting groundwater from contamination: "Here, plaintiffs' claims are *not* brought for purposes of regulating motor vehicle emissions control, they concern groundwater contamination caused by spills and leakage of gasoline containing MTBE, and are therefore outside the scope of the preemption provision." *MTBE,* 175 F. Supp. 3d at 612 (emphasis in original).

5

Moreover, the complete preemption doctrine does not apply here because the Clean Air Act nowhere purports to preempt all state-law rights of action, and nowhere substitutes a Federal civil statutory right of action in place of the state-law rights of action asserted in this case. To the contrary: As Judge Scheindlin noted, *see MTBE* at 613 n.35, the Act *expressly preserves* state-law rights of action. *See* 42 U.S.C. § 7604(e) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute *or common law* to seek enforcement of any emission standard or limitation *or to seek any other relief*"; emphasis added). The Sixth Circuit, confronted with a claim that the complete preemption doctrine applied to cases involving the Clean Air Act, rejected it because the Act's savings clause belied any notion that Congress had intended the Act completely to preempt state-law claims. *See Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 342–44 (6th Cir. 1989).

Defendants also invoke the complete preemption doctrine because, they claim, this case and others like it amount to "an all-out assault on one of the central pillars of interstate commerce," because "these tort claims have the potential to interfere with federal gasoline regulation." Notice of Removal at ¶ 12 n.2. But Defendants offer no law in support of this novel application of the doctrine, and they totally ignore the tests established by the Supreme Court for applying it. Moreover, its factual predicate is wrong. In New York, Defendants, through their trade group Oxygenated Fuels Association ("OFA"), sought to overturn New York's total ban on the use of MTBE on precisely this ground — that EPA regulations must preempt the ban because it would have ruinous consequences on the sale of gasoline in New York. *See Oxygenated Fuels Ass'n v. Pataki*, ___ F. Supp. 2d ___, 2003 WL 22845949 (N.D.N.Y. Nov. 21, 2003) (Mordue,

6

J.). Following a six-day bench trial, Judge Mordue squarely rejected Defendants' assertion that the MTBE ban would have a substantial impact on the sale of gasoline in New York, and that in any event such effects would not "interfere with the achievement of the goals of the" Clean Air Act so as to justify a finding of preemption. *Id.* Judge Mordue concluded:

> [OFA] has not demonstrated that N.Y. MTBE Law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting [the Clean Air Act]. The Court reaches this conclusion regardless of whether [the Act's] goal of enhancing air quality is viewed as limited to air quality alone, or whether it is viewed in the larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations.

*Id.* Since, obviously, a complete ban of MTBE from future gasoline sales is far more disruptive to the supply of gasoline than are lawsuits seeking compensation for injuries arising from past gasoline sales, Defendants' argument has even less merit here than it had in *Pataki*.

The Court should take notice of the fact that these Defendants, acting through the American Petroleum Institute ("API"), the OFA and other trade groups, are vigorously lobbying for enactment of H.R. 6, "The Energy Policy Act of 2003," now pending in the Congress. Section 1502(a) of that bill, if enacted, would exempt Defendants from state-law products liability claims for MTBE contamination such as the products liability claim posed in this case. Section 1502(a) further provides:

> Nothing in this Section shall be construed to affect the liability of any person for environmental remediation costs, drinking water contamination, negligence for spills or other reasonably foreseeable events, public or private nuisance, trespass, breach of warranty, breach of contract, or any other liability other than liability based upon a claim of defective product.

(Exhibit A).

7

### III. Defendants Cannot Claim To Act As Officers Of The United States Government Merely By Complying With Federal Regulations.

Defendants, without citation to a single case or other authority, attempt to justify their removal of this case under 28 U.S.C. § 1442(a)(1). *See* Notice of Removal ¶ 49. Section 1442(a)(1) provides for removal of cases brought against

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office.

28 U.S.C. § 1442(a)(1). According to Defendants, they blend MTBE into their gasoline at the direction of the Clean Air Act and EPA regulations, and so act as "officers" of the United States for the purposes of removal under this section.

There is a good reason why Defendants offer no authority to support their position. Defendants invite this Court, in effect, to Federalize all tort litigation against manufacturers of products subject to Federal regulation — cigarettes, automobiles, pharmaceuticals, asbestos, and too many other consumer and industrial products too numerous to mention. If the Court were to adopt Defendants' reading of section 1442(a)(1), the Federal judiciary would soon drown in removed state-court tort suits. No court has gone so far (for obvious reasons) and many have rightly rejected the notion that claims against manufacturers making products subject to Federal regulation can be removed under this provision. *See, e.g., Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411, 417–18 (D.N.H. 2002) ("the mere fact that a tobacco company has complied with the requirements of a federal law cannot suffice to transform it into a federal actor any more than the compliance with a myriad of private enterprises with federal law and administrative regulations could of itself work such a transformation"); *Little v. Purdue Pharma, LP*, 227 F.

9

to payment only when its water is contaminated with Defendants' MTBE. Plaintiffs' complaint does not allege that Plaintiffs had suffered their injuries by April 1987. Defendants have offered no evidence that Plaintiffs had a claim to assert for contaminated groundwater by April 1987. No record exists on which to find that Plaintiffs' claim might have been discharged by Texaco's confirmation order. Defendants fail their threshold burden of proving their entitlement to removal on this ground.

Second, the confirmation order could not discharge Plaintiffs' claim as against Texaco because Texaco did not provide Plaintiffs with notice that the claim would be discharged if Plaintiffs did not file the claim in the bankruptcy. As the Supreme Court stated in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950): "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Accord City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 294 (1953) (applying *Mullane's* due process notice requirements to bankruptcy bar date and discharge matters); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (Bankruptcy Code "obliges a Debtor to engage in full and fair disclosure" of its obligations "during the entire reorganization process" beginning "on day one, with the filing of the Chapter 11 petition"); *In re Texaco Inc.*, 254 B.R. at 561 (following *Mullane*). Where the claimant's identity is ascertainable by "reasonably diligent methods," the debtor must provide actual, personal notice. *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983); *see id.*, 462 U.S. at 800 ("actual notice is a minimum constitutional

precondition" where the claimant's identity is ascertainable); *accord, e.g., Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 490–91 (1988).

Here, Plaintiffs have pleaded extensive, detailed allegations as to the knowledge, prior to 1988, of Texaco and the other Defendants as to the unique hazards MTBE posed to groundwater reserves, on which many municipalities rely for their drinking water. *See* Complaint ¶¶ 147-212. Texaco, aware of these hazards, was required by *Mullane* and its progeny to give public water providers such as Plaintiffs notice sufficient to alert them that they had claims to assert, and that they would lose them if they did not file them in the Texaco bankruptcy. Texaco, having failed to provide such notice, cannot now seek to shield itself from these claims on grounds that they were discharged by its 1988 confirmation order — and most certainly cannot remove the entire case on grounds that it is somehow related to the Texaco bankruptcy.

Third, equitable estoppel precludes Texaco from invoking its confirmation order in this instance. The Texaco bankruptcy petition was triggered by a ruinous judgment Pennzoil won against it. Texaco structured its reorganization so as to resolve its Pennzoil obligations without affecting its obligations to its other creditors. As the *In re Texaco* bankruptcy judge, Adlai Hardin, recently recounted, Texaco's "Disclosure Statement and the Plan provided that all contracts not rejected under Section 365 were deemed assumed *and that all creditors (other than Pennzoil) and all equity holders were to be unimpaired in their rights*" under that confirmed plan. *In re Texaco*, 254 B.R. at 561 (emphasis added). Given these representations in Texaco's plan and disclosure statement, and Texaco's failures of notice consistent with the requirements of *Mullane*, Judge Hardin found that Texaco was estopped from invoking its confirmation order to

14

avoid performing its "prudent operator" clean-up obligations under oil and gas leases it had not expressly adopted during its bankruptcy. *See id.*

Such a result is all the more appropriate here, where the whole gravamen of Plaintiffs' complaint is that Texaco and the other Defendants fully knew of the hazards of MTBE well before Texaco's 1987 bankruptcy, but systematically conspired to hide those hazards from Plaintiff and the public. *See* Complaint ¶¶ 147-212. Texaco's suppression of the knowledge of MTBE's hazards, and of the claims that would follow from its release into the environment, compounded by its failure to provide meaningful notice to Plaintiff during its bankruptcy, and its violation of the duties of disclosure imposed by the Code, *see In re Momentum Mfg. Corp.*, 25 F.3d at 1136, ought here to estop these Defendants from invoking Texaco's confirmation order either as a defense to this case or as a ground for its removal.

Fourth, whatever Texaco's right to invoke the bankruptcy jurisdiction for a determination of the scope of its confirmation order, such jurisdiction in any event does not extend to the dozens of other Defendants that Plaintiffs have sued for their injuries, all of whom are strangers to the Texaco bankruptcy. At most, the Court ought to sever Texaco and remand the rest of the case to the state court so it can proceed against the remaining Defendants, over whom no bankruptcy jurisdiction colorably exists.

## V. The Court Should Award Plaintiffs Their Costs And A Reasonable Attorney Fee For The Improper Removal.

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). Defendants' removal has no foundation in the law or the facts governing this case. Plaintiffs respectfully ask

15

the Court to exercise its discretion and provide them with such relief as the Court deems appropriate under the statute.

## CONCLUSION

For the foregoing reasons, this Motion for Remand should be granted forthwith, and an award of costs and fees under 28 U.S.C. § 1447(c) granted.

Dated: December __12__, 2003.

                                      Respectfully Submitted,

                                      _/s/ Richard Sandman_____

                                      Richard M. Sandman
                                      RODMAN, RODMAN & SANDMAN, PC
                                      BBO No. 440940
                                      442 Main Street, Suite 300
                                      Malden, MA  02148-5122
                                      Telephone:  (781) 322-3720
                                      Fax:  (781) 324-6906

                                      Scott Summy (subject to Admission Pro Hac Vice)
                                      Texas Bar No. 19507500
                                      BARON & BUDD, P.C.
                                      3102 Oak Lawn Avenue, Suite 1100
                                      Dallas, Texas 75219-4281
                                      Telephone:  (214) 521-3605
                                      Fax: (214) 520-1181

                                      Robert Gordon (subject to Admission Pro Hac Vice)
                                      WEITZ & LUXENBERG, P.C.
                                      180 Maiden Lane, 17th Floor
                                      New York, NY   10038-4925
                                      Telephone: (212)  558-5505
                                      Fax: (212) 558-5506

                                      *Attorneys for Plaintiffs*

# EXHIBIT A

F:\TB\HR6\ENERGY.CMD

767

          (iv) reformulated gasoline containing renewable fuel; and

     (B) submit to Congress, and make publicly available, a report on the results of the survey under subparagraph (A).

  (2) RECORDKEEPING AND REPORTING REQUIREMENTS.—The Administrator of the Environmental Protection Agency (hereinafter in this subsection referred to as the "Administrator") may require any refiner, blender, or importer to keep such records and make such reports as are necessary to ensure that the survey conducted under paragraph (1) is accurate. The Administrator, to avoid duplicative requirements, shall rely, to the extent practicable, on existing reporting and recordkeeping requirements and other information available to the Administrator including gasoline distribution patterns that include multistate use areas.

  (3) APPLICABLE LAW.—Activities carried out under this subsection shall be conducted in a manner designed to protect confidentiality of individual responses.

**SEC. 1502. FUELS SAFE HARBOR.**

  (a) IN GENERAL.—Notwithstanding any other provision of Federal or State law, no renewable fuel, as defined by section 211(o)(1) of the Clean Air Act, or methyl tertiary butyl ether (hereinafter in this section referred to as "MTBE"), used or intended to be used as a motor vehicle fuel, nor any motor vehicle fuel containing such renewable fuel or MTBE, shall be deemed a defective product by virtue of the fact that it is, or contains, such a renewable fuel or MTBE, if it does not violate a control or prohibition imposed by the Administrator of the Environmental Protection Agency (hereinafter in this section referred to as the "Administrator") under section 211 of such Act, and the manufacturer is in compliance with all requests for information under subsection (b) of such section 211 of such Act. If the safe harbor provided by this section does not apply, the existence of a claim of defective product shall be determined

F:\TB\HR6\ENERGY.CMD

768

under otherwise applicable law. Nothing in this subsection shall be construed to affect the liability of any person for environmental remediation costs, drinking water contamination, negligence for spills or other reasonably foreseeable events, public or private nuisance, trespass, breach of warranty, breach of contract, or any other liability other than liability based upon a claim of defective product.

(b) EFFECTIVE DATE.—This section shall be effective as of September 5, 2003, and shall apply with respect to all claims filed on or after that date.

**SEC. 1503. FINDINGS AND MTBE TRANSITION ASSISTANCE.**

(a) FINDINGS.—Congress finds that—

(1) since 1979, methyl tertiary butyl ether (hereinafter in this section referred to as "MTBE") has been used nationwide at low levels in gasoline to replace lead as an octane booster or anti-knocking agent;

(2) Public Law 101–549 (commonly known as the "Clean Air Act Amendments of 1990") (42 U.S.C. 7401 et seq.) established a fuel oxygenate standard under which reformulated gasoline must contain at least 2 percent oxygen by weight;

(3) at the time of the adoption of the fuel oxygen standard, Congress was aware that significant use of MTBE would result from the adoption of that standard, and that the use of MTBE would likely be important to the cost-effective implementation of that program;

(4) Congress was aware that gasoline and its component additives can and do leak from storage tanks;

(5) the fuel industry responded to the fuel oxygenate standard established by Public Law 101–549 by making substantial investments in—

    (A) MTBE production capacity; and

    (B) systems to deliver MTBE-containing gasoline to the marketplace;

November 18, 2003 (2:02 AM)

# EXHIBIT B

requirements isolate affected markets and, in the event of a supply disruption, could cause shortages and price volatility, as experienced in two of the last four years in Chicago and Milwaukee. Sixteen states already have enacted MTBE bans or caps and additional states are considering bans.

In addition, there needs to be recognition that even without federal legislation, ethanol is going to be in our gasoline system in increased amounts – at a minimum to fulfill the federal oxygen content requirement for RFG. But the current rules allow little flexibility in how, when, and where ethanol would be used. We need a federal solution that phases down MTBE in a uniform manner and allows the use of renewable fuels where it makes the most economic sense.

The Federal RFG Oxygen Requirement and State MTBE Bans

Let me briefly review the situation we face: In 1990, Congress amended the Clean Air Act to require the use of RFG in areas with the worst ozone pollution. Congress decided that RFG had to meet certain emissions performance standards but also had to include a specific amount of oxygen. The two most widely used oxygenates at the time were MTBE and ethanol. Most of the RFG oxygenate demand was on the coasts, where ethanol use faced significant economic, transportation, and handling challenges relative to MTBE. As a result, as Congress full well expected, MTBE became the most commonly used oxygenate in areas near the coast. Ethanol became the oxygenate of choice in the Midwest due to favorable economics and proximity to ethanol supply. However, when gasoline was spilled or leaked and MTBE came into contact with water supplies, odor and taste issues arose with even very small concentrations of MTBE.

Many state governments reacted by banning the use of MTBE. Unfortunately, there is considerable variation in the start dates and requirements for these laws. For example, Connecticut's ban starts on October 1, 2003, while neighboring New York's starts on January 1, 2004. Some allow incidental amounts of MTBE to remain, while others do not. Differing state gasoline requirements will complicate and increase the likelihood of disruptions in the supply/distribution system; this will place considerable stress on the efficiency and, therefore, the reliability of the gasoline distribution system -- unless federal legislative changes are made to the fuels provisions of the Clean Air Act.

Harmful Effects of State MTBE Bans

In the absence of federal legislation, consumers will be subject to the uncertainties posed by uncoordinated state actions. Individual states are restricting the use of MTBE, but they cannot change the federal RFG oxygen content requirement. That requirement is unnecessary, uneconomical and inflexible. It requires the use of an oxygenate in each gallon of gasoline in RFG areas. It is driving New Hampshire, for example, to opt-out of the federal RFG program and try to impose a state oxy-flexible RFG program, which could add yet another boutique fuel to the system if they are successful. Maintaining the status quo – with the federal RFG oxygen requirement in place and states continuing to ban MTBE – will require using ethanol in RFG areas where it may not be cost-effective. Alternatively, other states may pursue solutions that further fragment the market in new and different ways.

Currently, most of the RFG is required on the east and west coasts, yet ethanol is predominantly manufactured in the Midwest. As additional state MTBE bans start to take effect, RFG markets will, by default, need to use ethanol in each and every gallon of RFG in order to meet the federal oxygen content requirement. The Connecticut, California and New York MTBE bans alone are expected to result in ethanol demand in those states of about 1.1 billion gallons in 2004. There are no assurances that the full extent of the infrastructure needed to transport the added amount of ethanol will be in place in time to assure a smooth transition. As states get closer to the implementation

contaminated a drinking water supply. There are legitimate concerns about the potential risks of renewable fuels, and Congress may address those concerns by including a requirement that the EPA take a more active regulatory role than it has in the past. The protection afforded by a safe harbor provision would apply only to renewable fuels and additives that had been approved by EPA.

Conclusion

To conclude: If Congress fails to act, consumers are likely to face the increasing costs of uncoordinated state MTBE bans – leading to increased strains on the fuel distribution system. While individual states are restricting use of MTBE, they cannot change the inflexible federal RFG oxygen requirement. Maintaining the status quo of the federal oxygen requirement and state MTBE bans will force the use of large volumes of ethanol in a very inflexible and unnecessarily costly fashion – and it could severely burden, if not disrupt, fuels distribution and supply.

The carefully crafted provisions I have discussed, as part of a package that meets our objectives, are supported by an historic coalition including API, numerous farm and ethanol interests, Northeast state air quality officials and environmental interests and were passed by the Senate last year as part of the comprehensive energy bill. They offer carefully considered solutions to the fuels problems that have challenged fuel providers and burdened American consumers. They protect important environmental benefits achieved by reformulated gasoline. We strongly urge Congress to adopt similar legislation.

#####

# EXHIBIT C

## NEW HAMPSHIRE PREPARED TO CONTINUE WITH MTBE SUIT...(Cont'd from p1)

New Hampshire filed a lawsuit in late September against 20 oil firms for selling or producing gasoline containing MTBE, which has contaminated water supplies in the state (see OFN, 10/13/03, p5). The state alleges the plaintiffs produced a "defective product," created a public nuisance and violated state environmental and consumer protection laws.

But language included in the final energy conference report would prevent producers from being sued under claims that MTBE is a defective product. That provision would apply to all lawsuits filed after Sept. 5, meaning that the rash of lawsuits filed using the "defective product" argument prior to Oct. 1, the date initially thought to be the cutoff, will no longer to be able to use that claim (see OFN, 10/13/03, p1). That would include the New Hampshire case.

But New Hampshire does plan on going ahead with its lawsuit, Maureen Smith, assistant attorney general for the state, confirmed to OFN last week. While admitting the product defect argument "is a key factor" in their lawsuit, she said there are several other claims the state can use, including public nuisance claims. If the energy bill passes, she said she isn't "sure how that would affect our case... But we will proceed with this [case] until told not to do so."

New Hampshire Attorney General Peter Heed called the MTBE liability relief provision and the retroactive Sept. 5 date "an obvious attempt to derail New Hampshire's right to have its MTBE pollution claims heard by a court of law."

Similar sentiments were shared by New York attorney Robert Gordon, whose lawfirm Weitz and Luxemberg is involved in numerous lawsuits over MTBE contamination in a handful of states. He said he was "surprised" and "outraged" with the provision's inclusion in a final energy report. While all of their lawsuits' claims deal with product defect, as well as negligence, "the heart of the lawsuit is product defect," he said. Taking that argument away is "like sending us to Iraq with squirt guns," he claimed.

But Oxygenated Fuels Association spokesman Frank Maisano for the contends "product liability is not the heart of their [MTBE] cases." He said states and water associations "should have absolutely no problem suing" MTBE producers or manufacturers over other claims and "in fact, they ought to do that," if the producers have been negligent in some way. –R. Gantz



To: Hart Downstream Energy Services    NC/RC
1201 Seven Locks Rd., Suite 300
Potomac, MD 20854; 301/354-2046; 800/897-HART

Please: ☐ Begin my subscription to:
      ☐ Continue my subscription to:

☐ Oxy-Fuel News--1 year for $1395 enclosed
☐ Octane Week--1 year for $1695 enclosed
☐ Diesel Fuel News--1 year for $797 enclosed
☐ Gas-to-Liquids News--1 year for $595 enclosed
(Outside North America add US$100)

☐ MasterCard   ☐ VISA   ☐ AMEX   ☐ Discover

Card No._____ Exp. Date_____
Signature_____
Name_____
Title_____
Organization_____
Address_____
City _____ State____ ZIP_____
E-mail Address:_____

OXY-FUEL NEWS (ISSN 1072-8759) is published weekly by Hart Downstream Energy Services, a division of Chemical Week Publishing LLC.
Editorial offices: 1201 Seven Locks Road, Suite 300
Potomac MD 20854
Phone: 301/354-2046; FAX: 301/424-7260

**HART**

Editor: Rachel Gantz, rgantz@chemweek.com
Editorial Director: Robert Gough
  rgough@chemweek.com
Markets Editor: Suzanne McElligott
  smcelligott@chemweek.com
Contributing Editors: Carol Cole,
  Jack Peckham, Jeremy Glunt
  coletraveler@aol.com
  jpeckham@chemweek.com
  jglunt@chemweek.com

Production Manager: Jennifer Burtchette
Senior Marketing Manager: Dawn Lewis
Executive Director, Hart Downstream
  Energy Services: Frederick L. Potter
President, Hart Publications:
  Richard A. Eichler
CEO, Chemical Week Associates:
  Michael Silber
New Orders/Client Services:
  1 (800) 897-HART

Subscription: $1395 per year (outside North America add US$100). Hart Publications, Inc. is a leading publisher of energy newsletters. For subscription information, see the attached coupon. Copyright 2003. All rights reserved. Reproduction of this newsletter, in whole or in part, without prior written consent of Hart Downstream Energy Services, is prohibited. Federal copyright law prohibits unauthorized reproduction by any means and imposes fines up to $100,000 for violations. Permission to photocopy for internal or personal use is granted by Hart Downstream Energy Services, provided that the appropriate fee is paid directly to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923. Phone: (978) 750-8400.



# RODMAN RODMAN & SANDMAN
## ATTORNEYS AT LAW

*CLERKS OFFICE*
*2003 DEC 12 P 5:01*
*DISTRICT COURT*
*DISTRICT OF MASS.*

December 12, 2003

**BY HAND**

Clerk for Civil Business
United States District Court
  for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
Suite 2300
1 Courthouse Way
Boston, MA 02210

    Re:    **Town of Duxbury, et al., v. Amerada Hess Corporation, et al.**
              **U.S.D.C., District of Massachusetts, C.A. No.: 2003-12399RGS**

Dear Sir or Madam:

Enclosed for filing in the above matter please find the following:

1. Plaintiffs' Motion for Remand;
2. Memorandum of Law in Support of Plaintiffs' Motion for Remand;
3. Exhibits A-C.

Kindly date-stamp both the enclosed copy of this letter and the enclosed copy of Plaintiffs' Motion for Remand to acknowledge receipt and return them to me.

Thank you for your attention to this matter.

                              Very truly yours,

                              RODMAN, RODMAN & SANDMAN, P.C.

                              Richard M. Sandman

RMS/lz
c:    All Counsel of Record